**BRIGHT WOOD CORPORATION,**
Appellant,

v.

**BANKERS STANDARD INSURANCE COMPANY, Respondent,**

California Insurance Company,
Respondent.

No. C5–02–2075.

Court of Appeals of Minnesota.

July 22, 2003.

Paul A. Banker, Thomas C. Mielenhausen, Eric J. Nystrom, Lindquist & Vennum, PLLP, Minneapolis, MN, for appellant.

Thomas S. Fraser, Richard D. Snyder, Fredrikson & Byron, P.A., Minneapolis, MN, for respondent Bankers Standard Insurance Company.

Jeanne H. Unger, Diane B. Bratvold, Kimberly A. Ross, Rider, Bennett, LLP, Minneapolis, MN, for respondent California Insurance Company.

Considered and decided by HUDSON, Presiding Judge, KALITOWSKI, Judge, and FORSBERG, Judge.

## OPINION

FORSBERG, Judge.*

In this declaratory judgment action, appellant insured, Bright Wood Corporation, challenges the grant of summary judgment to respondent insurers, Bankers Standard Insurance Company and California Insurance Company. Respondents denied coverage for damages incurred when wood window sash components supplied by appellant Bright Wood failed to meet contract specifications, forcing its customer, Scherer Brothers Lumber Company, to remove and replace all window sashes suspected of containing the defective components. Bright Wood contends that summary judgment was inappropriately granted because genuine issues of material fact remain concerning whether property other than its product was damaged or rendered useless. We disagree and affirm.

## FACTS

Bright Wood Corporation manufactures wood sash components for windows. Scherer Brothers Lumber Company manufactures windows using components provided from various suppliers. In 1996, Scherer entered into a contract with Bright Wood through JJJ Specialty Company, a building materials representative, to supply the wood components that surround the glass in a window sash. In its contract with Bright Wood, Scherer specified that the wood sash components had to be treated with a wood preservative to prevent rot. From October 1996 to November 1997, Bright Wood failed to treat the sash components sold to Scherer. While reviewing milling records in late 1997, a Bright Wood employee discovered that the

components had not been treated; Bright Wood did not inform either Scherer or its insurers about the problem, but began to treat the components with a preservative. Unaware of the problem, Scherer continued to use both treated and untreated components, installing them in between 50,000 and 90,000 sash units.

In late 1997, Scherer received at least two service requests for windows with problems with discoloration and stripped hardware. In 1998, while inspecting for hail damage after a bad storm, Scherer noticed a number of windows with discolored sash components and began to receive numerous complaints about discolored or deteriorating windows. Scherer notified Bright Wood that there appeared to be a problem with Bright Wood's preservative process. On December 1, 1999, Bright Wood's CEO, Dallas Stovall, met with representatives of Scherer and JJJ, the building materials representatives, to discuss the increasing problem of rotting windows. Stovall did not disclose the failure to treat the wood, but on December 3 notified Bright Wood's insurance agent of a potential liability. On January 14, 2000, Stovall wrote to JJJ stating that a review of Bright Wood's records indicated that from October 1996 through November 1997, it failed to treat the wood sash components supplied to Scherer with preservatives.

Scherer embarked on a repair program. Initially, Scherer responded to complaints and replaced visibly defective parts during field visits. It found that it could not reliably determine which sash units would rot and began on-site replacement of all wood sash components manufactured in 1996 and 1997. During these repairs, the windows showed no other damage or dete-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

rioration except to the Bright Wood components. However, in order to replace the wood sash components, Scherer technicians necessarily had to remove weather stripping, hardware, and aluminum cladding. The windows also had to be refinished.

As the scope of the problem grew, Scherer decided it was more efficient to replace the entire window with a newly manufactured window; although material costs were somewhat higher, labor costs were lower. This again meant that window finishes had to be redone to match. In all the inspections and replacements, no defect or damage was noted in any part of the windows except to the wood sash components provided by Bright Wood. The only damage to non-Bright Wood components occurred during the repair process.

Scherer sued Bright Wood for breach of contract and warranties. The two companies settled for $8.2 million in December 2001. In February 2001, Bright Wood brought this declaratory judgment action, after respondents Bankers Standard Insurance Company and California Insurance Company both denied coverage. California provided comprehensive general liability coverage for Bright Wood from January 1, 1995 to January 1, 1998. Bankers provided comprehensive general liability coverage beginning January 1, 1998. California moved for summary judgment, asserting that because Scherer did not start receiving complaints until 1998, any occurrence, as defined in its policy, happened after its policy period ended on January 1, 1998. On August 14, 2002, the district court denied California's summary judgment motion, stating that issues of fact remained as to whether California had notice of claims made during its policy period.

Both Bankers and California moved for summary judgment based on various policy exclusions. Both policies contain an exclusion for property damage to the insured's product "arising out of it or any part of it." Both policies also contain a so-called "sistership" exclusion, excluding coverage for

[d]amages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

   * * *

(3) "Impaired property";

if such product * * * or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

"Impaired property" is defined in both policies as

tangible property, other than "your product" * * * that cannot be used or is less useful because:

  a. It incorporates "your product" * * * that is known or thought to be defective, deficient, inadequate or dangerous; or

  b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

  a. The repair, replacement, adjustment or removal of "your product" * * *; or

  b. Your fulfilling the terms of the contract or agreement.

Bright Wood argued that because the repair and replacement process damaged non-Bright Wood components, neither exclusion applied. Bright Wood produced evidence showing that the cost of replacing weather stripping and aluminum cladding

and providing new finishes, formed a significant part of the cost of repair or replacement.

On September 27, 2002, the district court granted summary judgment to California and Bankers, concluding that the policies were unambiguous and, based on the sistership exclusion, clearly excluded the property damage to the wood sash components, as the insured's product, and any other damage to the sash, including replacement costs. Bright Wood appeals.

## ISSUES

1. Did the district court err in granting summary judgment based on policy exclusions denying coverage for damage to the insured's product that arose out of the product?

2. Did the district court err in granting summary judgment based on policy exclusions denying coverage for damages caused by the repair or replacement of the insured's product or property impaired by the insured's product?

## ANALYSIS

This court reviews a grant of summary judgment to determine whether there are any genuine issues of material fact and whether the district court correctly applied the law. *Burlington N. R.R. Co. v. Comm'r. of Revenue*, 606 N.W.2d 54, 57 (Minn.2000). The interpretation of an insurance policy is a question of law reviewed de novo. *Thommes v. Milwaukee Ins. Co.*, 641 N.W.2d 877, 880 (Minn.2002).

Insurance contracts are subject to the usual principles of contract interpretation. *Id.* Thus, if unambiguous, the language of a policy must be given its plain and ordinary meaning. *Id.* The policy must be interpreted to give effect to the intent of the parties and any ambiguity must be resolved in favor of the insured. *Id.* Exclusions from coverage are interpreted in the same way and are strictly construed against the insurer. *Id.*

## I. Insured's Own Product Exclusion

The district court concluded that the provision excluding property damage to the insured's own product arising out of the product precluded coverage. This clause has been interpreted to bar coverage in the case of product failure. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Futura Coatings, Inc.* 993 F.Supp. 1258, 1264 (D.Minn.1998) (concluding cost of repairs excluded where damage caused by insured's defective product); *Carpole's Inc. v. Ins. Co. of N. Am.*, 544 F.Supp. 6, 7 (D.Minn.1982) (barring coverage for damage caused by insured's liquid fertilizer shipped in defective containers).

This exclusion has also been interpreted to deny coverage for the cost of repairs necessitated by the defective product, including anticipated future repair costs. *Futura Coatings*, 993 F.Supp. at 1264. In *Carpole's*, the district court concluded that coverage was barred not only for the defective containers, but also for the costs of cleaning up the ensuing leakage of liquid fertilizer. *Id.*, 544 F.Supp. at 7–8; *see also Jacob v. Russo Builders*, 224 Wis.2d 436, 592 N.W.2d 271, 277 (App.1999) (interpreting similar policy language to exclude coverage for defective masonry in home construction and concluding that damages to interior, driveway, sidewalk, patio, and landscaping that incurred during repair of masonry were also not covered).

The damage here is based solely on Bright Wood's defective product. The incidental damage to the finish, hardware, and weather-stripping was incurred only in order to make repairs. No evidence was introduced of damage to any product other than Bright Wood's components, except insofar as the non-Bright Wood compo-

nents incurred damage during the repair process.

This interpretation is consistent with the general scope of the commercial general liability policy. These policies are intended to cover damage arising out of an "occurrence," which is defined in both policies as "an accident" and damage "not expected or intended" by the insured. Here, the damage to other property occurred because of repairs deliberately undertaken. The resulting damage is not an accidental occurrence.

■ Bright Wood has produced no evidence of damage occurring to other property except in the course of repair. A genuine issue of material fact must be established by substantial evidence. *DLH, Inc. v. Russ*, 566 N.W.2d 60, 69–70 (Minn. 1997). We conclude that the district court did not err by granting summary judgment on this basis.

## II. Sistership Exclusion

■ The district court also held that the so-called sistership exclusion provided a basis for denial of coverage. The theory of the sistership exclusion, which excludes coverage when a product is withdrawn, recalled, or replaced because of a known or suspected defect discovered in a similar product, is that the insurer should not be

saddled with the cost of preventing such defects or failure any more than it was intended that the insurer would pay the cost of avoiding the defect in the first place or preventing the first failure of the product to have been discovered to be in a defective or dangerous condition before the occurrence.

*Atlantic Mut. Ins. Co. v. Judd Co.*, 380 N.W.2d 122, 124–25 (Minn.1986) (quoting 2 R. Long, *Law of Liability Insurance* § 11.11 (1983)). To qualify under the exclusion, the repair or replacement process must include more than product that has already failed; there is no withdrawal or recall where no attempt is made to prevent future failures. *Id.* at 125. Here, because Scherer could not identify which wood components would fail, it had to replace all components that could be defective, thus fitting squarely within the sistership exclusion.

Bright Wood argues that the sistership exclusion cannot apply, because the definition of "impaired property" requires that (1) the property incorporating the insured's defective product can be restored to use by simply removing the insured's defective product; and (2) "other property" must be essentially undamaged, except for the inclusion of the insured's defective product. Relying on *Pinkerton & Laws, Inc. v. Royal Ins. Co.*, 227 F.Supp.2d 1348 (N.D.Ga.2002), Bright Wood asserts that "other property" could not be restored to use and was damaged because Scherer began replacing weather stripping, cladding, and finishes.

*Pinkerton*, however, did not involve a situation where the insured's product had been incorporated into a unit of property, rendering that unit of property defective. The insured in *Pinkerton* had improperly installed windows, which were not defective; the improper installation had resulted in damage to the windows. *Id.* at 1355. Here, the Scherer windows were defective only because they contained Bright Wood's defective product; removal and replacement of Bright Wood's components restored the windows to use. Scherer's business decision to replace its windows with brand-new units in order to lower its labor costs does not change this situation.

Although the repair process required weather stripping, cladding, and finishes to be replaced in some instances, these components are so integral to each window unit that they cannot be considered as other property. *See Transp. Corp. of Am., Inc. v. Int'l Bus. Machs. Corp.*, 30 F.3d 953, 957 (8th Cir.1994) (concluding "where

a defect in a component part damaged the product into which that component was incorporated, economic losses to the product as a whole were not losses to 'other property.' ") (quoting *Minneapolis Soc'y of Fine Arts v. Parker-Klein Assocs. Architects Inc.*, 354 N.W.2d 816, 820 (Minn. 1984)).

The damage here occurred only during the repair and replacement process. Although Bright Wood asserts that genuine issues of material fact are outstanding, it has provided no evidence of damage except during the repair and replacement process. The district court therefore did not err in granting summary judgment.

## DECISION

The district court did not err in granting summary judgment excluding coverage under respondents' policies. Bright Wood only produced evidence of damage that occurred during the repair and replacement of its defective product. Because this type of damage is excluded by its policies, the grant of summary judgment to respondent insurers was proper.

**Affirmed.**