# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1305

_____

Corn Plus Cooperative,      *
     *
         Plaintiff - Appellant,      *
     *
         v.      *    Appeal from the United States
     *    District Court for the District of
Continental Casualty Company,      *    Minnesota.
and Lumbermens Mutual Casualty      *
Company,      *
     *
         Defendants - Appellees.      *

_____

Submitted: November 13, 2007
Filed: February 7, 2008

_____

Before MURPHY, HANSEN, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

Corn Plus Cooperative ("Corn Plus") brought this declaratory judgment claim against Continental Casualty Company ("Continental") and Lumbermens Mutual Casualty Company ("Lumbermens") to enforce a settlement it had reached with its mechanical contractor who was insured by appellees. The district court[1] determined

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

that the insurance policies did not cover all of appellant's claims and thereafter granted summary judgment to the insurers, concluding that the settlement was unreasonable because it had failed to allocate between covered and noncovered damages. The court also refused to enforce an addendum to the settlement agreement for public policy reasons. Corn Plus appeals, and we affirm.

Corn Plus is a Minnesota cooperative which operates an ethanol processing facility. In January 2001 Corn Plus hired Wanzek Construction, Inc. ("Wanzek"), a general mechanical contractor, to perform welding work in an expansion of its ethanol facility in Winnebago, MN. Under their contract Wanzek was responsible for welding the pipes that carry the corn mash used to produce ethanol. While Wanzek substantially completed its work, it did not meet the project specifications due to incomplete weld penetration, which resulted in bacterial contamination of the corn mash as it lodged in cavities caused by the incomplete welds. Corn Plus asserts that the bacterial contamination has led to decreased ethanol production and cannot be permanently eliminated, although it can be alleviated with antibiotics. For these reasons Corn Plus claims that repairs of the defective welds are necessary to avoid the risk of structural damage to the piping system.

In January 2002 Wanzek brought a mechanic's lien foreclosure action against Corn Plus in Minnesota state court arguing that Corn Plus owed it $1.4 million for its welding work under the contract. Corn Plus counterclaimed on a number of grounds, including breach of contract and negligence, and alleged damages as a result of Wanzek's defective welding of the pipes.

Wanzek carried commercial general liability insurance of up to $1 million with Continental and excess coverage insurance with Lumbermens. Wanzek tendered Corn Plus's counterclaims to Continental, its primary insurer. Continental and Lumbermens both denied coverage, contending that their policies excluded coverage for repairing Wanzek's faulty work. Nevertheless Continental agreed to defend Wanzek against the counterclaim subject to a reservation of its rights to contest coverage. In May 2003

Continental brought a declaratory judgment action against Wanzek in state court submitting that it had no duty to defend or indemnify Wanzek for the counterclaims that resulted from the defective welding. Lumbermens was not party to this declaratory judgment action.

After Corn Plus and Wanzek failed in an initial attempt to mediate, a second effort was undertaken in December 2003. Corn Plus submitted a mediation brief itemizing its alleged damages from the faulty welding, which amounted to approximately $7.6 million. Corn Plus made a $2.5 million cash settlement offer which Wanzek rejected. Instead, Wanzek proposed a Miller-Shugart[2] settlement in the same amount. Corn Plus and Wanzek informed Continental and Lumbermens that they were negotiating a Miller-Shugart settlement, but neither insurer chose to participate in the negotiations or to provide settlement funds.

Corn Plus and Wanzek reached a Miller-Shugart agreement in March 2004 to settle their case for $2.5 million. Wanzek stipulated to negligence in its welding resulting in damages to the ethanol manufacturing process and facility. The agreement, which includes a severability provision, did not allocate the $2.5 million into itemized damages. As part of the settlement, Corn Plus agreed to pay Wanzek approximately $400,000 to satisfy Wanzek's $1.4 million demand for breach of contract and mechanic's lien claims. The parties also entered into an addendum which provided that if a court were to find the $2.5 million amount unreasonable, it should determine the largest fair and reasonable amount and substitute that for the $2.5

---

[2]In a Miller-Shugart settlement, an insured (such as Wanzek) who has been denied coverage for a claim agrees with the claimant (such as Corn Plus) on a judgment for an amount collectible from the insurance policy. The claimant releases the insured from personal liability and the claimant's recovery is limited to the amount obtained from the insurers. This type of settlement bears the name of the case Miller v. Shugart, 316 N.W.2d 729 (Minn. 1982).

million. The state trial court approved the settlement between Corn Plus and Wanzek and ordered that judgment be entered pursuant to the agreement.

In light of the Miller-Shugart agreement Corn Plus moved to intervene as a defendant in the declaratory judgment action between Continental and Wanzek. The state trial court granted the motion and dismissed Wanzek. Because the $2.5 million Miller-Shugart agreement exceeded Continental's $1 million coverage policy, Lumbermens, the excess coverage insurer, intervened as a plaintiff in the declaratory judgment action. The court also realigned the parties, designating Corn Plus as plaintiff and Continental and Lumbermens as defendants.

Lumbermens removed the case to federal district court on diversity of citizenship grounds, and Corn Plus subsequently filed an amended complaint seeking a declaratory judgment that its claims are covered by the insurers' policies and that its Miller-Shugart agreement with Wanzek is enforceable. Corn Plus then moved for partial summary judgment on the coverage issue and argued that the insurers' policies cover not just the contaminated corn mash and its consequential damages, but also the costs to repair Wanzek's defective work and all attendant current and future economic losses. The district court ruled that property damage caused by Wanzek's faulty welding triggered insurance coverage. It identified the covered property damage as the bacterially contaminated corn mash and consequential costs causally related to the contamination, such as antibiotic treatments and disinfection of the mash, cleaning of the pipes, and plant shutdowns required to change cooling lines and address centrifuge issues. The district court also concluded, however, that two policy exclusions (the "damage to your work" exclusion and the "impaired property" exclusion) precluded coverage for repairing the defective welding and its consequential costs, as well as for loss of use of the facility, including decreased ethanol production, caused by its incorporation of the defective welds.

Following the coverage decision, the insurers moved for summary judgment asserting that the Miller-Shugart agreement is unenforceable. The district court

granted their motion because the Miller-Shugart agreement had not allocated the damages by type of loss, and the settlement amount thus included covered and noncovered claims. The district court also declined to enforce for public policy reasons the agreement's addendum, which purported to empower a court to determine a reasonable settlement amount if it found the agreement unenforceable.

Corn Plus appeals the summary judgment grant in favor of the insurers on several grounds, claiming that the district court incorrectly ruled that the insurance policy exclusions barred coverage for welding repairs and consequential loss of use of the facility. It also argues that the district court erred in finding the Miller-Shugart agreement unreasonable and in refusing to enforce its addendum. Finally, Corn Plus seeks an order to reinstate its underlying litigation with Wanzek if we uphold the district court's rulings. The insurers ask us to affirm, choosing not to appeal the district court's conclusion that the contaminated corn mash and related damages are not excluded from coverage.

We review the district court's interpretation of the terms of the insurance policy and its grant of summary judgment de novo. Macheca Transport Co. v. Philadelphia Indem. Co., 463 F.3d 827, 831 (8th Cir. 2006). Summary judgment is appropriate if the record shows no genuine issue of material fact, entitling the moving party to a judgment as a matter of law. McPherson v. O'Reilly Automotive, Inc., 491 F.3d 726, 730 (8th Cir. 2007). Because this case is in federal court based on diversity jurisdiction, Minnesota's substantive law controls our analysis of the insurance policy. See National American Ins. Co. v. W&G, Inc., 439 F.3d 943, 945 (8th Cir. 2006). The extent of a policy's coverage is determined by the specific terms of the insurance contract. Wanzek Construction, Inc. v. Employers Insurance of Wausau, 679 N.W.2d 322, 327 (Minn. 2004). While the insured carries the initial burden of showing coverage, the onus is on the insurer to establish policy exclusions. Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006).

The threshold issue before us is whether any of the damages implicated by the $2.5 million settlement were within the scope of Wanzek's insurance policies, which provided coverage for "property damage" caused by an "occurrence." Property damage is defined as "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physically injured." It is undisputed that Wanzek's defective welding constituted an occurrence resulting in property damage, but the insurers contend that two policy exclusions limit their coverage. The damage to your work exclusion precludes coverage for "'property damage' to 'your work' arising out of it or any part of it." "Your work" is defined as "work or operations performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations." The impaired property exclusion applies to impaired property or property that has not been physically injured if the damage arises out of a "defect, deficiency, inadequacy, or dangerous condition in 'your product' or 'your work'", or "a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." Impaired property is defined by the policies as tangible property other than the insured's work or product that is less useful or devoid of use because it incorporates the insured's defective work or the insured has failed to fulfill the terms of the contract, provided that it can be restored to use by repairing or replacing the insured's work or fulfilling the terms of the contract.

Corn Plus argues that the loss of use of the plant during welding repairs is a consequence of the corn mash contamination and thus not precluded by the policy exceptions.[3] See Western World Ins. Co. v. H.D. Eng'g Design & Erection Co., 419 N.W.2d 630, 635-36 (Minn. Ct. App. 1988) (insurance coverage for damage to third

[3]The insurers assert that Corn Plus is barred from arguing this point in light of the district court's refusal to permit its amended complaint to allege that the contaminated corn mash led to reduced production of ethanol and caused damage to the equipment and plant shutdowns (since insurers claimed no prior notice of these allegations). We need not decide this procedural dispute, however, because Corn Plus's argument fails on the merits.

party property and consequential costs resulting from accident). Corn Plus also submits that the damage to your work exclusion bars coverage only for damages to the insured's own product, but not to damages to third party property. See Sphere Drake Insurance Co. v. Tremco, Inc., 513 N.W.2d 473, 482 (Minn. Ct. App. 1994) (damage to your work exclusion "bars coverage for damage to the insured own's work, but not damage to other property").

As the insurers point out, Corn Plus's argument that costs associated with repairs of the defective welding are consequences of the corn mash contamination is faulty. Any necessary repairs to the welding and consequential losses are not the result of the corn mash contamination, but arise out of Wanzek's faulty workmanship. It is undisputed that Wanzek conducted defective welding when connecting the piping at Corn Plus's facility; any repairs and associated costs caused by this work are therefore barred by the damage to your work exclusion. See, e.g., Bor-Son Building Corp v. Employers Comm. Union Ins. Co. of America., 323 N.W.2d 58, 63 (Minn. 1982) (insurance does not cover repair or replacement of defective work); Bright Wood Corp. v. Bankers Standard Ins. Co., 665 N.W.2d 544, 548-49 (Minn. Ct. App. 2003) (no coverage for damages incurred during repair of insured's faulty product or work); Sphere Drake Insurance Co., 513 N.W.2d at 479 (cost of redoing the insured's defective work is excluded from coverage); Ebenezer Soc. v. Dryvit Systems, Inc., 453 N.W.2d 545, 548 (Minn. Ct. App. 1990) (no coverage for building and structural damage under general liability policy because it is not intended to guarantee the insured's workmanship). Moreover, the insurance policies cover only those damages resulting from an occurrence, which is defined as an "accident", whereas losses caused by deliberate repairs are not accidental and thus excluded from coverage. See Bright Wood Corp., 665 N.W.2d at 549; Western Nat. Mut. Ins. Co. v. Barbes, 2006 WL 1704201 at *4 (Minn. Ct. App. 2006).

In addressing the impaired property exclusion, Corn Plus submits that the language of the exclusion is ambiguous and must therefore be construed against the insurer and in favor of coverage. See Wanzek Construction, Inc., 679 N.W.2d at 324-

25 (while unambiguous policy language is given its usual and accepted meaning, ambiguities are interpreted in favor of coverage). The insurers point out, however, that Corn Plus did not raise this argument in the district court and thereby failed to preserve it for this appeal. See Aaron v. Target Corp., 357 F.3d 768, 779 (8th Cir. 2004) (arguments raised for the first time on appeal are generally not considered). Even if we were to overlook this waiver, Corn Plus's contention that the impaired property exclusion is ambiguous is unpersuasive. See Westfield Insurance Co. v. Weis Builders, Inc., 2004 WL 1630871 at *6 (D.Minn. 2004) ("After reviewing the policy as a whole and considering the plain and ordinary meaning of the terms used, the Court finds that exclusion (m) [impaired property exclusion] is not ambiguous."). We therefore treat the impaired property exclusion as unambiguous and interpret it according to the plain meaning of its language.

Corn Plus contends that Wanzek's defective welding physically injured its property, and thus consequential damages such as loss of the facility's use and decreased ethanol production are not excluded since the impaired property exclusion applies only to property that has not been physically injured. See, e.g., Bright Wood Corp., 665 N.W.2d at 549; Gaylord Chemical Corp. v. ProPump, Inc., 753 So.2d 349, 355 (La. Ct. App. 2000). Corn Plus's argument is inapposite because the injured property in question is not the ethanol facility, but the contaminated corn mash, which cannot be repaired and is hence not subject to the exclusion. The facility itself, on the other hand, qualifies as impaired property under both prongs of this exclusion. Corn Plus's piping system is tangible property made less useful because it incorporates Wanzek's defective work and because Wanzek failed to fulfill the terms of the contract, but the system can be restored to use through repairing the insured's work. See Bright Wood Corp., 665 N.W.2d at 549; Bethke v. Assurance Co. of Am., 2002 WL 31655357 at *2 (Minn. Ct. App. 2002) (impaired property exclusion applies to loss of use of home since loss causally related to insured's failure to build home in timely manner). We conclude that the district court did not err in finding that the damage to your work exclusion and the impaired property exclusion bar coverage for

the costs associated with repairing the faulty welding and for loss of the facility's use due to the incorporation of the defective welds.

We next address whether the Miller-Shugart agreement entered into by Corn Plus and Wanzek is valid under Minnesota law. A Miller-Shugart agreement is enforceable against an insurer if it meets three conditions: the insured provided notice to its insurer of its intent to enter into such agreement; the settlement is not the product of fraud or collusion; and the settlement is reasonable and prudent. Miller, 316 N.W. 2d at 733-35. The party seeking enforcement has the burden to prove that the settlement was reasonable. Id. at 735. Reasonableness depends on multiple factors and is determined as of the time of the settlement. Jorgensen v. Knutson, 662 N.W.2d 893, 904-05 (Minn. 2003). We apply de novo review to the district court's determination that the Miller-Shugart agreement was unreasonable as a matter of law because it did not allocate damages between covered and noncovered claims. See Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., 477 F.3d 583, 589 (8th Cir. 2007).

Corn Plus asserts that the settlement consists only of covered damages resulting from Wanzek's negligence. The insurers point out that the plain language of the agreement belies that contention, since it incorporates damages sustained to the "ethanol manufacturing process *and* facility" in the sum of $2.5 million (emphasis added). In addition, Corn Plus's attorney admitted during her deposition that consequential damages to repair Wanzek's welding were included in arriving at the settlement amount. The record establishes that the Miller-Shugart settlement encompassed both covered and uncovered damages.

Corn Plus acknowledges that Miller-Shugart agreements which fail to allocate damages among multiple defendants are unreasonable and thus unenforceable. See Bob Useldinger & Sons, Inc. v. Hangsleben, 505 N.W.2d 323, 331 (Minn. 1993). It seeks to distinguish the instant situation, however, by asserting that there is no requirement to allocate damages in cases involving a single defendant. That

distinction is unpersuasive and contrary to precedent, under which the failure to allocate the settlement amount by damage item precludes enforcement of a Miller-Shugart agreement consisting of covered and noncovered claims. See Ebenezer Society, 453 N.W.2d at 549 (no probable cause that insurers liable because no allocation of claims in case involving single defendant); Bor-Son Building Corp., 323 N.W.2d at 64 (no duty to indemnify because settlement agreement failed to allocate which funds were paid toward covered claim). The requirement in Bob Useldinger & Sons that the insured allocate damages among multiple defendants applies with equally compelling logic to the allocation of damage items in cases of a single defendant. Absent such allocation, a judicial determination into the reasonableness of the Miller-Shugart settlement is impractical since the parties are naturally in a better position to calculate the damages. Moreover, parties would also be tempted to inflate their covered claims post hoc if they were permitted to designate a settlement amount without damage allocation. We agree with the district court that this Miller-Shugart agreement is unreasonable as a matter of law.

In the event that their Miller-Shugart agreement were deemed unenforceable, Wanzek and Corn Plus adopted an addendum providing that the court "shall determine on a summary basis what the largest fair and reasonable settlement amount is and substitute that amount." The district court rejected the addendum, explaining that the Minnesota Supreme Court has specifically considered and dismissed this approach on public policy grounds. See Alton M. Johnson Co. v. M.A.I. Co., 463 N.W.2d 277, 280 (Minn. 1990). Offering guidance to courts faced with an unreasonable Miller-Shugart agreement for which coverage is established, the Minnesota Supreme Court considered three alternatives and declined either to dismiss the action against the insurer altogether or to allow the trial court to estimate a reasonable damage award; instead, it reasoned that reinstatement of the plaintiff's underlying tort claim against the insured would be the best default option. See id.

Corn Plus seeks to distinguish this case from that default option by pointing out that the parties in Alton M. Johnson had not chosen a fallback remedy if their

agreement were invalidated. Although Minnesota law grants parties freedom to contract and favors settlements, which are not to be voided unless they violate public policy, Katun Corp. v. Clarke, 484 F.3d 972, 976 (8th Cir. 2007), the peculiar nature of Miller-Shugart agreements warrants policy considerations that differ from those governing traditional settlements because liability is imposed on a nonparticipant whose interests are not represented. See, e.g., Koehnen v. Herald Fire Ins. Co., 89 F.3d 525, 529 (8th Cir. 1996) (insured has no incentive to drive hard bargain in Miller-Shugart settlement negotiations because he bears no personal liability due to indemnification by the insurer, who is not a party to the settlement); Indep. Sch. Dist. No. 197 v. Accident & Cas. Ins. of Winterthur, 525 N.W.2d. 600, 607 (Minn. Ct. App. 1995) ("[D]ynamics of Miller-Shugart settlements make settlement amount more suspect than in other consent settlements because a defendant with little to lose may agree to an inflated judgment amount in order to avoid personal liability"). Mindful of those concerns, the Minnesota Supreme Court explicitly disallowed courts to estimate damages and thereby relieve the settlement parties of their duty to arrive at a reasonable amount. We thus agree with the district court's refusal to enforce the addendum in light of Minnesota's public policy espoused in Alton M. Johnson.

Finally, Corn Plus asks us to reinstate its underlying tort action against Wanzek if we decline to enforce the Miller-Shugart agreement, an issue which the district court did not reach. While parties to an unreasonable Miller-Shugart agreement are ordinarily returned to the status quo ante, Koehnen, 89 F.3d at 530, Corn Plus expressly waived any possibility of reinstating its claims against Wanzek "regardless of whether any recovery is made on the Judgment from Wanzek's insurers." That is because it stipulated in the agreement that "in the event it is determined that the Policies afford no coverage or indemnity or that, for whatever reason, Corn Plus is not successful in recovering against the Policies on its claims, then Corn Plus shall have no further rights against Wanzek." Because of the severability provision in the Miller-Shugart agreement this contractual waiver to pursue further litigation is unaffected by the lack of enforceability of other parts of the agreement.

The factual situation in the instant case is not analogous to Alton M. Johnson, which reinstated the action in fairness to the parties who had not contemplated a remedy in the event their Miller-Shugart agreement were found unenforceable. We acknowledge that the waiver produces a harsh result for Corn Plus because it will be unable to pursue its claims against Wanzek, while the insurers have no liability despite the district court's determination that some of Corn Plus's claims against Wanzek are covered by their policies.[4] Notwithstanding Minnesota's generally unfavorable inclination toward forfeitures, Alton M. Johnson, 463 N.W.2d at 280 (avoiding "harsh overkill of a forfeiture"), Corn Plus has not demonstrated that the agreement's contractual waiver provision is contrary to public policy. See Christensen v. Eggen, 577 N.W.2d 221, 225 (Minn. 1998) ("[P]ublic policy requires that freedom of contract remain inviolate except only in cases when the particular contract violates some principle which is of even greater importance to the general public."). Corn Plus is a sophisticated party which knowingly entered into the settlement with the benefit of counsel and expressly waived the ability to reinstate its claims against Wanzek. We interpret the agreement's unequivocal language by applying a basic tenet of contract interpretation in accordance with Minnesota law and public policy. See Team Nursing Services, Inc. v. Evangelical Lutheran Good Samaritan Soc., 433 F.3d 637, 640 (8th Cir. 2006) (under Minnesota law courts must "give all terms their plain, ordinary meaning so as to effect the intent of the parties.").

For these reasons, we affirm the judgment of the district court and decline to reinstate the litigation underlying the settlement between Corn Plus and Wanzek.

_____

_____

[4]The insurers point out that the settlement provides Corn Plus with substantial consideration from Wanzek, since it included the reduction of Wanzek's outstanding contract claims from over $1.4 million to approximately $400,000.